**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
District Judge Christine M. Arguello**

Civil Action No. 14-cv-02356-CMA

WIGHTY W. VELARDE,

      Applicant,

v.

LOU ARCHULETA, Warden, Fremont Corr. Facility, and
THE ATTORNEY GENERAL OF THE STATE OF COLORADO,

      Respondents.

_____

**ORDER DENYING PETITION FOR HABEAS CORPUS**
_____

**Christine M. Arguello, District Judge.**

      The matter before the Court is an Application for a Writ of Habeas

Corpus Pursuant to 28 U.S.C. § 2254.  ECF No. 16.  The Court has determined it can

resolve the Application without a hearing.  *See* 28 U.S.C. § 2254(e)(2); Fed. R.

Governing Section 2254 Cases 8(a).

## I.  BACKGROUND

      Applicant pleaded guilty to second degree murder and one count of attempted

sexual assault.  *See* Pre-Answer Resp., App. C, ECF No. 9-3, at 4.  In the only appeal

that Applicant submitted to the Colorado Court of Appeals (CCA) challenging both his

direct appeal and the denial of his Colo. R. Crim. P. 35(c) postconviction motion, *see id.*

at 3, the CCA summarized the underlying facts and proceedings as follows:

> According to the presentence report, officers discovered the
> victim's deceased body in a hotel room, with blood on the mattress, bloody
> bedding on the floor, and bloody bedding in the bathroom.  It looked like
> there had been a struggle in the room.

Velarde thereafter told the police the following account of the victim's death.  He said he and the victim, who was his wife, had been drinking heavily before engaging in "real hard sex," which included his penetrating her anally, with both his penis and his fingers.  He further said that she began bleeding heavily, originally saying that she was bleeding from menstruation but later adding that he noticed blood coming from her anus.  He said that she then lost consciousness and he could not revive her with CPR.  He said that he believed the victim died from a heart attack.

The doctor performing the autopsy concluded that the victim bled to death from injuries to her anus.

Velarde was charged with first degree murder (specifically felony murder) and two counts of sexual assault.  Pursuant to a plea agreement, Velarde pleaded guilty to second degree murder and one count of attempted sexual assault, and the other counts were dismissed.  The parties stipulated to a term of thirty-three years in prison for the second degree murder count and a concurrent term of six years for the attempted sexual assault count.

Prior to sentencing, Velarde moved to withdraw his plea, alleging, as pertinent here, that when he pleaded guilty (1) he had a defense, specifically, that his wife had died of a heart attack before he accidentally caused her to bleed, and (2) his plea counsel pressured him into pleading guilty.

After a hearing on the motion, at which Velarde and his plea counsel both testified, the district court denied the motion to withdraw the plea, reasoning that (1) counsel had considered the "heart attack" defense but found it implausible and the "heart attack" defense was neither new nor a surprise to Velarde and (2) plea counsel had not inappropriately pressured Velarde to plead guilty.

After sentencing, Velarde filed Crim. P. 35(c) motions for postconviction relief, alleging, as pertinent here, that plea counsel was ineffective for failing to (1) investigate whether the victim's cause of death related to heart issues, (2) consider intoxication as a defense to the sexual assault charges, and (3) advise him of his right to testify.  He also alleged that his post-plea counsel had been ineffective in failing to perfect an appeal of the denial of his motion to withdraw his guilty plea.

After hearings at which Velarde, plea counsel, and post-plea counsel testified, the postconviction court concluded, in a thorough and detailed order, that plea counsel had not provided ineffective assistance.  In so concluding, the postconviction court found that plea counsel had (1)

2

reviewed the available evidence on the victim's cause of death, and acted within his professional judgment in pursuing a potential defense of consent that would rely on the cause of death stated by the coroner; (2) thoroughly explored the issue of intoxication as a potential defense; and (3) advised Velarde of his right to testify.  The postconviction court also concluded that post-plea counsel had been ineffective in failing to perfect an appeal of the denial fo Velarde's motion to withdraw his guilty plea, and thus reinstated Velarde's right to file such an appeal.

*People of the State of Colo. v. Velarde*, No. 12CA2183,1-4 (Colo. App. June 26, 2014).

## II.  HABEAS CLAIMS

Applicant, acting *pro se*, initiated this action on August 25, 2014, and

subsequently, pursuant to Court order, filed an Amended Application on November 10,

2014.  He asserts four claims in the Amended Application as follows:

(1) An unknowing and involuntary plea entered in violation of the Fourteenth Amendment;

(2) Ineffective assistance of counsel for failure to investigate the possible defenses of voluntary intoxication and victim's heart attack;

3) Ineffective assistance of counsel for failure to advise of automatic sentence enhancer and for gross misadvise regarding parole eligibility; and

4) Ineffective assistance of counsel for failure to seek suppression of statements to police upon arrest.

Am. Application, ECF No. 16.

On November 11, 2014, Magistrate Judge Boyd N. Boland entered an order

directing Respondents to file a Supplemental Pre-Answer Response regarding the

November 10, 2014 Amended Application and address the affirmative defenses of

timeliness under 28 U.S.C. § 2244(d) and exhaustion of state court remedies under 28

U.S.C. § 2254(b)(1)(A) if Respondents intended to raise either or both of those

defenses.  Respondents filed a Supplemental Pre-Answer Response on November 24,

2014.  Applicant filed a Supplemental Reply on December 18, 2014.  Respondents concede in the Pre-Answer Response that the Application is timely, but they argue that Claim Two is unexhausted and Claims One, Three, and Four are anticipatorily defaulted.

This Court reviewed the Amended Application, Supplemental Pre-Answer Response, and Supplemental Reply and determined that Claim Two is exhausted.  The Court also deferred a ruling on whether Applicant had demonstrated cause for his procedural default under *Martinez v. Ryan*, — U.S. —, 132 S.Ct. 1309 (2012), pending the Court's receipt of the state court record in the criminal case at issue.  Respondents were directed to file an answer that fully addresses the merits of Claim Two, and if they desired to include additional arguments concerning the merits of Claims One, Three, and Four.

Respondents filed an Answer, ECF No. 25, on January 21, 2015.  Applicant filed a Traverse, ECF No. 29, on March 9, 2015.

## III.  LEGAL STANDARDS

### A.  *Pro Se* Standard of Review

Applicant is proceeding *pro se.*  The Court, therefore, "review[s] his pleadings and other papers liberally and hold[s] them to a less stringent standard than those drafted by attorneys."  *Trackwell v. United States*, 472 F.3d 1242, 1243 (10th Cir. 2007) (citations omitted); *see also Haines v. Kerner*, 404 U.S. 519, 520-21 (1972).  However, a pro se litigant's "conclusory allegations without supporting factual averments are insufficient to state a claim on which relief can be based."  *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).  A court may not assume that an applicant can prove facts

that have not been alleged, or that a respondent has violated laws in ways that an

applicant has not alleged.  *Associated Gen. Contractors of Cal., Inc. v. Cal. State*

*Council of Carpenters*, 459 U.S. 519, 526 (1983).  An applicant's pro se status does not

entitle him to an application of different rules.  *See Montoya v. Chao*, 296 F.3d 952, 958

(10th Cir. 2002).

**B.  28 U.S.C. § 2254**

Section 2254(d) provides that a writ of habeas corpus may not be issued with

respect to any claim that was adjudicated on the merits in state court, unless the state

court adjudication:

> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the State
> court proceeding.

28 U.S.C. § 2254(d).

The Court reviews claims of legal error and mixed questions of law and fact

pursuant to 28 U.S.C. § 2254(d)(1).  *See Cook v. McKune*, 323 F.3d 825, 830 (10th Cir.

2003).  The threshold question pursuant to § 2254(d)(1) is whether Applicant seeks to

apply a rule of law that was clearly established by the Supreme Court at the time his

conviction became final.  *See Williams v. Taylor*, 529 U.S. 362, 390 (2000).  The "review

under § 2254(d)(1) is limited to the record that was before the state court that

adjudicated the prisoner's claim on the merits."  *Cullen v. Pinholster*, ---- U.S. ----, 131

S. Ct. 1388, 1398 (2011).  "Finality occurs when direct state appeals have been

exhausted and a petition for writ of certiorari from this Court has become time barred or

has been disposed of." *Greene v. Fisher*, ---- U. S. ----, 132 S.Ct. 38, 44 (2011) (citing

*Griffith v. Kentucky*, 479 U.S. 314, 321, n. 6 (1987).

Clearly established federal law "refers to the holdings, as opposed to the dicta, of

[the Supreme] Court's decisions as of the time of the relevant state-court decision."

*Williams*, 529 U.S. at 412.  Furthermore,

> clearly established law consists of Supreme Court holdings in cases where
> the facts are at least closely-related or similar to the case *sub judice*.
> Although the legal rule at issue need not have had its genesis in the
> closely-related or similar factual context, the Supreme Court must have
> expressly extended the legal rule to that context.

*House v. Hatch*, 527 F.3d 1010, 1016 (10th Cir. 2008) (citation omitted).

If there is no clearly established federal law, that is the end of the Court's inquiry

pursuant to § 2254(d)(1).  *See id.* at 1018.  If a clearly established rule of federal law is

implicated, the Court must determine whether the state court's decision was contrary to

or an unreasonable application of that clearly established rule of federal law.  *See*

*Williams*, 529 U.S. at 404-05.

> A state-court decision is contrary to clearly established federal law if: (a)
> "the state court applies a rule that contradicts the governing law set forth
> in Supreme Court cases"; or (b) "the state court confronts a set of facts
> that are materially indistinguishable from a decision of the Supreme Court
> and nevertheless arrives at a result different from [that] precedent."
> *Maynard* [*v. Boone*], 468 F.3d [665,] 669 [(10th Cir. 2006)] (internal
> quotation marks and brackets omitted) (quoting *Williams*, 529 U.S. at
> 405). "The word 'contrary' is commonly understood to mean 'diametrically
> different,' 'opposite in character or nature,' or 'mutually opposed.' "
> *Williams*, 529 U.S. at 405 (citation omitted).

> A state court decision involves an unreasonable application of clearly
> established federal law when it identifies the correct governing legal rule
> from Supreme Court cases, but unreasonably applies it to the facts.  *Id.* at
> 407-08.  Additionally, we have recognized that an unreasonable
> application may occur if the state court either unreasonably extends, or

> unreasonably refuses to extend, a legal principle from Supreme Court precedent to a new context where it should apply. *Carter* [*v. Ward*], 347 F.3d. [860,] 864 [10th Cir. 2003] (quoting *Valdez* [*v. Ward*, 219 F.3d [1222] 1229-30 [10th Cir. 2000]).

*House,* 527 F.3d at 1018.

The Court's inquiry pursuant to the "unreasonable application" clause is an objective one. *See Williams*, 529 U.S. at 409-10. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather that application must also be unreasonable." *Id.* at 411. "[A] decision is 'objectively unreasonable' when most reasonable jurists exercising their independent judgment would conclude the state court misapplied Supreme Court law." *Maynard*, 468 F.3d at 671. In addition,

> [e]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations. [I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court.

*Harrington v. Richter*, 562 U.S. 86, 101 (2011) (internal quotation marks and citation omitted). The Court "must determine what arguments or theories supported or . . . could have supported[ ] the state court's decision" and then "ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Id.* at 102. "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (citation omitted). "Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for

ordinary error correction through appeal." *Id.* at 102-03 (internal quotation marks and citation omitted).

"[O]nly the most serious misapplications of Supreme Court precedent will be a basis for relief under § 2254." *Maynard*, 468 F.3d at 671.

Furthermore,

> [a]s a condition for obtaining habeas corpus relief from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Richter*, 562 U.S. at 103.

The Court reviews claims of factual errors pursuant to 28 U.S.C. § 2254(d)(2) and . *See Romano v. Gibson*, 278 F.3d 1145, 1154 n. 4 (10th Cir. 2002). Section 2254(d)(2) allows a court to grant a writ of habeas corpus only if the state court decision was based on an unreasonable determination of the facts in light of the evidence presented. Pursuant to § 2254(e)(1), the Court must presume that the state court's factual determinations are correct, *see Sumner v. Mata*, 455 U.S. 591, 592-93 (1982), and Applicant bears the burden of rebutting the presumption by clear and convincing evidence, *see Houchin v. Zavaras*, 107 F.3d 1465, 1470 (10th Cir. 1997). "The standard is demanding but not insatiable . . . [because] '[d]eference does not by definition preclude relief.' " *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)).

A claim, however, may be adjudicated on the merits in state court even in the absence of a statement of reasons by the state court for rejecting the claim. *Richter*, 562 U.S. at 98 ("[D]etermining whether a state court's decision resulted from an

unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning") (citations omitted).  Furthermore, "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Id.* at 99.

In other words, the Court "owe[s] deference to the state court's result, even if its reasoning is not expressly stated." *Aycox v. Lytle*, 196 F.3d 1174, 1177 (10th Cir. 1999).  Therefore, the Court "must uphold the state court's summary decision unless [its] independent review of the record and pertinent federal law persuades [it] that [the] result contravenes or unreasonably applies clearly established federal law, or is based on an unreasonable determination of the facts in light of the evidence presented." *Id.* at 1178.  "This 'independent review' should be distinguished from a full de novo review of the [applicant's] claims." *Id.* (citation omitted).  Likewise, the Court applies the AEDPA (Antiterrorism and Effective Death Penalty Act) deferential standard of review when a state court adjudicates a federal issue relying solely on a state standard that is at least as favorable to the applicant as the federal standard.  *See Harris v. Poppell*, 411 F.3d 1189, 1196 (10th Cir. 2005).  If a claim was not adjudicated on the merits in state court, and if the claim also is not procedurally barred, the Court must review the claim *de novo* and the deferential standards of § 2254(d) do not apply.  *See Gipson v. Jordan*, 376 F.3d 1193, 1196 (10th Cir. 2004).

## IV.  ANALYSIS

**A.  Claim Two**

Applicant asserts in Claim Two that counsel was ineffective because he failed to investigate the possible defenses of intoxication and heart attack.  ECF No. 16 at 6.  He further contends that counsel failed to explain to Applicant that voluntary intoxication is a defense to a murder charge.  *Id.*  Respondents argue that the "CCA plainly applied the correct governing principle and [A]pplicant does not point to any Supreme Court case reaching a result diametrically different" from the CCA's on materially identical facts," with respect to these claims.  ECF No. 25 at 19.

It was clearly established when Applicant was convicted that a defendant has a Sixth Amendment right to the effective assistance of counsel.  *See Strickland v. Washington*, 466 U.S. 668 (1984).  Ineffective assistance of counsel claims are mixed questions of law and fact.  *See id.* at 698.

To establish that counsel was ineffective, Applicant must demonstrate both that counsel's performance fell below an objective standard of reasonableness and that counsel's deficient performance resulted in prejudice to his defense.  *See id.* at 687.  "Judicial scrutiny of counsel's performance must be highly deferential."  *Id.* at 689.  "[A] court considering a claim of ineffective assistance must apply a strong presumption that counsel's representation was within a wide range of reasonable professional assistance."  *United States v. Rushin*, 642 F.3d 1299, 1306 (10th Cir. 2011) (citations and internal quotation marks omitted).  It is an applicant's burden to overcome this presumption by showing that the alleged errors were not sound strategy under the circumstances, *see Strickland*, 466 U.S. at 689, and that the errors were so serious that "counsel was not functioning as the counsel guaranteed the defendant by the Sixth

Amendment," *Rushin*, 642 F.3d at 1307 (quoting *Richter*, 562 U.S. at 104) (emphasis, citation, and internal quotation marks omitted). Applicant bears the burden of rebutting this presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). An applicant must show counsel failed to act "reasonably considering all the circumstances." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011) (quoting *Strickland*, 466 U.S. at 688, 690) (internal quotation marks omitted).

If Applicant fails to satisfy either prong of the Strickland test, the ineffective assistance of counsel claim must be dismissed. *See Strickland*, 466 U.S. at 697. Pursuant to § 2254(e)(1), the factual findings of the state courts are presumed correct. Finally, conclusory allegations that counsel was ineffective are not sufficient to warrant habeas relief. *See Humphreys v. Gibson*, 261 F.3d 1016, 1022 n.2 (10th Cir. 2001).

Under the prejudice prong, an applicant must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland* 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* In assessing prejudice under *Strickland* the question is whether it is reasonably likely the result would have been different. *Richter*, 562 U.S. at 111. "The likelihood of a different result must be substantial, not just conceivable." *Id.* at 112 (citing *Strickland*, 466 U.S. at 696.)

Furthermore, under AEDPA, "[t]he pivotal question is whether the state court's application of the Strickland standard was unreasonable. This is different from asking whether defense counsel's performance fell below Strickland's standard," which is the question asked "on direct review of a criminal conviction in a United States district court." *Richter*, 562 U.S. at 101. "When § 2254(d) applies, the question is not whether

counsel's actions were reasonable.  The question is "whether there is any reasonable argument that counsel satisfied Strickland's deferential standard."  *Id.* at 105.

### i. Heart Attack Defense

"The duty to investigate derives from counsel's basic function . . . to make the adversarial testing process work in the particular case."  *Williamson v. Ward*, 110 F.3d 1508, 1514 (10th Cir. 1997) (internal quotation marks omitted).  "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."  *Id.* (internal quotation marks omitted).  "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.  In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."  *Strickland*, 466 U.S. at 690-91.  "Counsel [is] entitled to formulate a strategy that [is] reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies."  *Richter*, 562 U.S. at 107.

With respect to the Heart Attack defense, the CCA found as follows:

B. The Alleged "Heart Attack" Defense

Here, concerning the alleged "heart attack" defense, Velarde testified that he told his plea counsel of a specific instance approximately two years prior to the victim's death where the victim had experienced heart palpitations and had received medical treatment in New Mexico, but plea counsel failed to investigate the medical records of that incident.

Plea counsel, in contrast, testified that his investigation for this case included reviewing discovery, interviewing Velarde, interviewing witnesses including the coroner, and visiting the crime scene.  Plea counsel further testified that based on the interview with the coroner and the medical evidence, he was developing a defense based on consent.  Specifically,

according to defense counsel, the medical evidence suggested that Velarde did not perform a particular nonconsensual sex act to which he had referred in a police interview.  Plea counsel further testified that he knew of Velarde's statements that the victim had an irregular heartbeat and that he had hazy memories of trying to obtain the victim's medical records in New Mexico, but ultimately there was no indication that heart failure was the cause of the victim's death.

On this evidence, the postconviction court concluded that Velarde failed to establish that plea counsel was ineffective in his consideration of the cause of death of the victim and whether an irregular heartbeat had any significance to this case.  The court found and reasoned that plea counsel reviewed the available evidence concerning the victim's cause of death, and that his decision to present a defense based on the cause of death stated by the coroner was well within his sound professional judgment.

Because the record supports these findings, we will not disturb the district court's conclusion that plea counsel was not ineffective in investigating any potential "heart attack" defense.  *See [People v.] Washington*, [2014 COA 41] ¶ 17, __ P.3d at ___ (We will not disturb the postconviction court's findings when they are supported by evidence in the record.).

*Velarde*, No. 12CA2183, at 12-14.

In the Traverse, relying on *Wiggins v. Smith*, 539 U.S. 510, 521-22 (2003), and *Strickland*, 466 U.S. at 691, Applicant agues that counsel had a duty to make reasonable investigations or make a reasonable decision that particular investigations were unnecessary.  Applicant further asserts that counsel only had vague recollections as to conducting investigations regarding the victim's previous medical history and provided no records that he did conduct such investigations.  ECF No. 29 at 4.  Applicant also contends that plea counsel admits in his testimony that he probably should have conducted a more thorough investigation of the coroner's findings to determine if there was a possibility that the victim died of a heart problem.  *Id.*

13

At the Rule 35(c) hearing, Applicant's plea attorney testified during direct
examination as follows regarding the victim's irregular heartbeat.

> Q.        No problem.  Mr. Cherner, I want to move on to
> talking about the investigation and specifically this issue of
> an irregular heartbeat in this case that the victim may have
> had.
>
>        Did Mr. Velarde ever discuss with you that the victim
> in this case had an irregular heartbeat.
>
> A.        I can't recall the conversation but I'm sure he did, and
> I think it's mentioned either in the discovery or in his videos.
> We were aware of it.  I just I can't remember how it came to
> us, that's right.  It might have been in the handwritten
> statement that he gave to police.
>
> Q.        What types of investigation did you do on that issue
> along with -- what type of investigation did you do with that
> issue to the best of your ability?
>
> A.        Well, I know I met with the coroner pretty early
> because I wanted to understand the cause of death.  This
> case was unusual to say the least in the way the death
> occurred, and I didn't have any experience in those kind of
> wounds.
>
>        So I met with him for an hour I think, maybe more,
> before the preliminary hearing, and I eventually decided to
> call him at the prelim so I know I talked to him again to prep
> his testimony, and then of course, we put him on the stand.
>
>        And either before or after the preliminary hearing, we
> took the coroner to the jail to physically examine Mr.
> Velarde's hands so he could understand their exact
> dimensions in preparation for using the same theory at trial.
>
>        It had to do with whether his hand was of a certain
> size relative to the injuries that were actually observed.  He
> testified at the preliminary hearing it was doubtful that Mr.
> Velarde could have caused -- I have that backwards.  It was
> doubtful that penetration could have occurred as deep as
> even Mr. Velarde claims in his own video because there was
> insufficient damage to the sphincter muscle at the anus.

Simply put, Mr. Velarde's hand would have caused more damage going through that opening than it did.  The internal damage was a different issue, but the lack of damage to the sphincter muscle tended to negate the fact that he penetrated the woman with his hand as deeply as he claimed he had, and that in turn was tied to the issue of consent.

Our argument was he didn't exceed the scope of consent between he and his wife.  Had he penetrated more deeply, he would have but he didn't.  That was our argument.

So that was part of our investigation, or really education is maybe a better way to put it, of the injuries and the mechanism of death.

You've had my file for months so I haven't had a chance to look back at my notes.  I have looked at what I have on the computer, but that's only a smidgen of what we generate.  So I don't have my notes of my interview with the coroner.

The People did provide me with a copy of the autopsy report the other day and I read through it again, but there wasn't any indication in the autopsy report that the cause of death was other than massive exsanguination of bleeding from the internal wounds in the anal area.

And there was a broken neck which was -- I'm not even sure it was premortem that didn't appear to have anything to do with the cause of death.  There was extensive liver damage I'm assuming from years of alcohol abuse and some other things, but there was no indication of heart failure from any cause.

Now, if I did this right.  I should have asked the coroner was there any indication of other cause of death that's not in your report and what about heart failure, et cetera.  I don't know if I did or did not because I haven't seen my notes.

But even if he -- well, to make a long story short, we didn't have any evidence that the cause of death was other than what the coroner set forth.

As we moved towards trial, we considered getting a second medical examiner look at it, but when I say it, I'm not entirely sure whether we were looking at that issue or whether we wanted to address the physical testimony, the expert testimony about the geometry of the wound and fist as I've explained, but I did notice I had a note on the computer about getting a second opinion from a pathologist.

Q.          Did your investigation -- did you ever investigate or get any documents from New Mexico or anywhere where the victim in this case was from about the irregular heartbeat or anything like that?

A.          Right.  It was an interesting situation.  My client may have been the holder of the medical privilege.  It goes like this.

I think the law is if a person dies, their privilege devolves down through their estate, and I don't remember if she had a will or not as I sit here, but if she died intestate, then the heir would be the husband probably, and I know we had some thinking are we the holder -- is Mr. Velarde the holder of the medical privilege by virtue of that and then the effort would be to try to get some medical records.

In reviewing the material I have available to me, I did see we tried to get other records of hers out of New Mexico and couldn't find any indication we tried to get medical records.  I have some hazy memories about that, but they're no more than hazy memories about getting the actual medical records.

Now, you asked if we did any investigation in New Mexico and we did by phone.  We did extensive investigation.  That was because the government was seeking to admit similars and eventually filed a motion along those lines, and they sent somebody down there for a couple days, the prosecution did, to interview any number of people in their hometown, Mr. Velarde's hometown.

We interviewed the same people and others by phone, and se we had an extensive investigation done in New Mexico about Mr. Velarde and Ms. Notsinneh's relationship over the years.

Q.　　　　To the best of your recollection, did you ever obtain any records dealing or see any records dealing specifically with the issue of the irregular heartbeat?

A.　　　　I don't know.  But I don't have any recollection of any evidence that the irregular heartbeat was an issue that we could use in court.  So my guess is we never got anything that helped us.

　　　　I do know it came up.  After I was no longer counsel, it came up in the Rule 32 motion and litigated there.

*Velarde*, No. 06CR236, Sept. 2, 2011 Rule 35(c) Hr'g at 22-28.

Plea counsel also testified at the change of plea hearing and stated as follows.

A.　　　　In that regard, one of the first things we did, and I do this in many murder cases because I find it very useful, is to sit down with the Coroner for an hour or an hour and a half and make sure I understand what's in that coroner's report.

　　　　If I remember right -- oh, no, that was another -- we met with the coroner in my office for over an hour.  We went over his report.  We had -- Leslie and I met with the coroner.  We had many questions for him.  He took it through -- he took us through and he actually gave us some helpful information, which led to him being called as a witness in the preliminary hearing by the defense.

　　　　And I consulted with at least one other coroner, as well.  And of course, I talked to Mr. Velarde and he was aware of the full range of evidence about cause of death, both from the coroner and all the other sources.  I did not see that this case could be defended on a claim that she died, but not because of Mr. Velarde's conduct.

Q.　　　　Well, your examination of the coroner in the document that we made an exhibit in this case has Dr. Gallagher [sic] stating that it would be highly unlikely that he could get his fist into the anus; you remember that?

A.　　　　Yes, That's Dr. Galloway.

Q.　　　　Galloway. Excuse me.

17

A.	And yes, that's correct.

Q.	And –

A.	But that tended to -- see, we put that on because in our view, and with all due respect, Your Honor, you were wrong about your ruling, but it had to do with cause of death  -- I'm sorry, not cause of death, but consent.

That was the -- that's why we put that on at the preliminary hearing, because we were arguing that the victim consented to the level of contact which was visited upon her by Mr. Velarde.  And we argued strenuously at the prelim that the coroner's testimony proved that he didn't reach in so far that he violated the scope of the consent which was implied or explicit in the relationship between he and his wife and the behavior leading up to that day and the behavior on that day.  So it's all a consent issue, not a cause of death issue.

*Id.*, Aug. 10, 2007 Withdraw Plea Hr'g at 73-74.

According to plea counsel's testimony at both the withdrawal of plea and Rule 35(c) hearings, counsel had discussed the coroner's report with the coroner, who confirmed that the cause of death was massive bleeding from the internal wounds in the anal area.  Based on these findings, plea counsel's strategy was to argue Applicant had not violated the scope of consent between Applicant and his wife making the issue of one of consent and not of cause of death.  Counsel further testified that because he did not have his notes available he could not say whether he asked the coroner if there possibly were other causes of death, but that would have been the proper question for him to ask.  Nonetheless, plea counsel testified that they did not have evidence otherwise that would have indicated cause of death was other than massive bleeding.

The Court finds that the CCA's credibility determination regarding plea counsel's testimony is supported by the record and these findings of facts are entitled to

deference.  *See Felkner v. Jackson*, 562 U.S. 594, 597 (2011) (under the Antiterrorism

and Effective Death Penalty Act (AEDPA) a trial court's determination based largely on

evaluation of credibility is entitled to great deference and is sustained unless clearly

erroneous) (citations and quotation marks omitted).  Plea counsel made reasonable

investigations, and as to not pursuing an investigation of the victim's medical records,

made a reasonable decision that any further investigation regarding this issue most

likely was unnecessary based on the autopsy report.

Even if trial counsel was ineffective, as Applicant suggests in the Traverse, in not

pursuing the alleged irregular heartbeat issue, Applicant fails to assert how he was

prejudiced by counsel's conduct.  Applicant does not assert what trial counsel would

have discovered if he had investigated the medical records and interviewed witnesses

that would support a cause of death other than massive bleeding.

Therefore, in light of the evidence presented in the state court proceedings, the

CCA's determination was reasonable.  The factual findings relied on by the trial court

are presumed correct in this federal habeas proceeding and are supported by the state

court record.  Because Applicant does not point to any clear and convincing evidence to

the contrary, *see* 28 U.S.C. § 2254(e)(1); *Cullen*, 131 S. Ct. at 1403, the Court finds that

Applicant has not demonstrated a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different.

Based on the above findings, the CCA decision regarding Applicant's irregular

heartbeat claim did not result in a decision that was contrary to, or involve an

unreasonable application of, clearly established federal law, as determined by the

Supreme Court of the United States and did not result in a decision that was based on

19

an unreasonable determination of the facts in light of the evidence presented in the

state court proceeding.  This claim, therefore, lacks merit and will be dismissed.

### ii.  Voluntary Intoxication

In the Traverse, Applicant concedes that plea counsel's investigations regarding

intoxication were sufficient.  The Court, therefore, dismisses this claim.   To the extent in

Claim Two Applicant asserts plea counsel incorrectly told him that intoxication is not a

defense to anything in his case, the CCA found as follows.

C. The Alleged Intoxication Defense

Concerning the intoxication defense, Velarde testified that his plea counsel told him that intoxication was absolutely not a defense to anything in his case and that he would not have accepted the plea agreement if he had known that intoxication could have been used as a defense.

Plea counsel, in contrast, testified to why intoxication was not a defense to the crime at issue and under the particular facts of this case. Specifically, plea counsel testified that he advised Velarde that intoxication is not a defense to a knowing crime.  Plea counsel further testified that although there was evidence that Velarde was very intoxicated during the crime, Velarde was nonetheless a "pretty good historian" of the crime – in lengthy and extensive police videos, he described the crime in detail – thus making it hard to argue that he was so drunk that he did not know what he was doing.  Plea counsel thus testified: "[S]etting aside whether intoxication is a defense to whatever he's charged with, you didn't have the facts to run with it even if it was a defense.  He was well able to describe what happened."

On this evidence, the postconviction court concluded that plea counsel was not ineffective in addressing the issue of intoxication and its possible use as a defense in this case.  The court found and reasoned that plea counsel thoroughly explored the issue of intoxication as a potential defense, explained to Velarde that intoxication could not be used as a defense to a knowing crime, and viewed the intoxication issue as complicated by the fact that Velarde provided a detailed history of the events surrounding the victim's death.

Because the record supports these findings, we will not disturb the district court's conclusion that plea counsel was not ineffective in his analysis of any potential intoxication defense. *See id.*

*Velarde*, No. 12CA2183, at 14-15.

Respondents argue Applicant fails to rebut with clear and convincing evidence the CCA's factual conclusion that he was not so intoxicated to be held responsible. Answer, ECF No. 25 at 23. Respondents further argue, relying on *People v. Harlan*, 8 P.3d 448, 470-71 (Colo. 2000), *overruled on other grounds by People v. Miller*, 113 P.3d 743 (Colo. 2005), that voluntary intoxication is not a defense to a "knowing" crime such as second degree murder, which is not a specific intent crime. *Id.* Given Applicant was not charged with, or pled guilty to, a crime that was a specific intent crime, Respondents further argue voluntary intoxication was not available as a defense to Applicant's crime. *Id.* at 24. Respondents, therefore, conclude that plea counsel's advice regarding the rejection of voluntary intoxication as a defense was correct and that counsel was not ineffective in his decision to not pursue this as a defense. *Id.* at 24-25.

Applicant fails to assert in either the Application or the Traverse any claim that counters Respondents' voluntary intoxication argument.

"Colorado statutes allow juries to consider evidence of a defendant's voluntary intoxication when it 'is relevant to negative the existence of a specific intent if such intent is an element of the crime charged.' " *People v. Lucas*, 232 P.3d 155, 162 (Colo. 2009) (quoting Colo. Rev. Stat. § 18-1-804(1)). Voluntary intoxication is not an affirmative defense, and only "sets forth a rule concerning the admissibility of evidence

of intoxication by the defendant to counter the prosecution's evidence that the

defendant had the requisite specific intent of the charged offense." *See id.*

At the Rule 35(c) hearing, plea counsel testified on direct examination as follows

regarding the possibility of a voluntary intoxication defense.

> Q.      Mr. Cherner, now I want to move on to talking about
> the defense of intoxication.  Did you and Mr. Velarde discuss
> the possibility of the defense of intoxication being raised in
> this case?
>
> A.      Yes.
>
> Q.      Can you just discuss to the best of your recollection
> what you remember those discussions being.
>
> A.      Well, the clearest piece comes from a memo that I
> wrote either right before or right after he pled in which I wrote
> down that we specifically talked about it.  I cited a case to
> him that said intoxication is not a defense to a knowing
> crime, answered all his questions about it.
>
> So my presentation to him at that point was it's not a
> defense because you're charged with knowing crimes.
> Whether we spoke about that earlier, I don't know.  We very
> well might have because intoxication was a big part of the
> facts in this case, or maybe internally the lawyers talked
> about it and we were aware of it.  We may or may not have
> told him about it.  I can't say for sure.
>
> But I know at some point based on that memo either
> right before or right after he pled, we did have a good
> discussion about it.
>
> Q.      Mr. Cherner, you just said intoxication was a big part
> of this case.  To the best of your recollection, can you just
> kind of go through how intoxication was part of this case.
>
> A.      It would be easier to say how it wasn't.  It would be a
> shorter conversation.  I'm sorry, but the case was drenched
> in alcohol.  Their relationship was built around alcohol.

Mr. Velarde if I remember right in the videos describes, and in his handwritten statement describes, a nonstop drinking binge, which apparently was a subset of lifestyle of drinking binges, starting at or during a conference that I think Ms. Notsinneh was attending in Fort Collins if I remember right, and they drank their way from Fort Collins to the Denver area.

The police found the room filled with alcohol containers.  The two of them are drunk the whole time they're in the motel.  Mr. Velarde leaves, drinks some more and ends up getting pulled over for drunk driving I think in the Springs with a blood alcohol in excess of .4.

So you could make the argument for the entire fact pattern he's intoxicated and not just a little but dramatically.  However, despite that, in the videos to the police which are extensive and lengthy, he describes in some detail everything that goes on.

There are periods where he mentions drifting in and out of consciousness, but he's a pretty good historian for all this unfortunately which I think in the courtroom would make it hard to argue that he was so drunk that he didn't know what he was doing.

So setting aside whether intoxication is a defense to whatever he's charged with, you didn't have the facts to run with it even if it was a defense.  He was well able to describe what happened.

I've only run intoxication as a defense once or twice I think in my career, and I don't know anybody -- that's overstating it.  In my judgment, it's a very, very risky defense.  It goes in that group if you've got nothing else, maybe that's what you're going to try.

I don't think juries are particularly enamored with the idea that you can go get yourself hammered and then go out and commit crimes.  That's the way they see it.  Technically it's not a crime if it's a defense, but the misconduct is not easily excused by jurors.  That's sort of my general belief but I've only actually run it a couple of times.

Q.          As to specifically the element of whether the victim knew -- whether the defendant knew the victim was incapable of appraising the nature of the victim's contact, did you ever discuss whether intoxication could be used to negate that specific element?

A.          I can't remember that I did.  I don't know what else to tell you about that.

*Velarde*, No. 06CR236, Sept. 2, 2011 Rule 35(c) Hr'g at 28-32.

Plea counsel went on to testify during cross examination as follows with respect

to the voluntary intoxication defense.

Q.          I want to turn it just a little bit. I have a few more questions in the area of intoxication then.  You talked about this some on direct examination.

Given that consent would have most likely been the defense and the best way to proceed in the case, did you then rule out intoxication or at least conclude that as part of the consent it may have been, but it would have been better to go with consent rather than straight on intoxication, or is there some sort of blending between the two?  If you can talk about that.

A.          Well, intoxication was problematic on two levels. One, it's not a defense to a knowing crime so you have to use it in some other fashion, but I never thought much about that because of the other problem.  The facts didn't back it up.

Despite the fact that Mr. Velarde was intoxicated or near death, over .4, he was able to do all kinds of things.  He described the sexual activity.  He described dealing with the death.  He described before and after.  He described why he left the body where he did, what he did after the death.  He described driving a vehicle.  In fact, he was apprehended 40 or 50 miles away and managed to drive.

But most importantly, he described the victim being in and out of consciousness which is the $ 64,000 piece of evidence if you're the prosecutor.  In his own words, he said I knew she was conscious and unconscious.

Well, then, however much you and I might need to drink, Mr. Velarde didn't have enough to drink to prevent him from knowing what's going on.  At least my fear was that was how a jury would have looked at it.

Q.       Sir, I want to talk to you about your recollection as to Mr. Velarde drinking and at what point he may have been fully intoxicated.

Is it fair from your review or your memory from the case that there is at least some information from Mr. Velarde's statement that after he realized the victim died, then he started to consume alcohol at that point?

A.       Well, yes.  He had more after, not to say he didn't have a lot before.  But yeah, I think he describes drinking whiskey, I can't remember, either while he's driving south or before he gets in the car.  I can't remember the exact sequence, but yes.

Q.       Does he also describe drinking whiskey in the hotel room after he realized that she had died?

A.       Let me -- yes, he does.

Q.       So it's fair that there's at least an argument, and see if you considered this, that while he may have had some intoxication level, he clearly spiked that intoxication level after he realized the victim died.  Is that fair or not fair?

A.       Well, that was going to be the government's argument if we raised intoxication.  They were going to hint he wasn't as drunk as defense would argue he was until after the offense, but that wasn't a very credible argument for your side frankly.

Q.       Okay. But it was at least something that you knew would have been presented based on some of the information and the descriptions that Mr. Velarde had provided.

A.       It occurred to us.

Q.          But it was more his description and his written statement that led you to believe that he was able to describe this and have a good memory of the event.

A.          Unfortunately, yes, that's correct.

*Id.* 53-56.

Therefore, in light of the evidence presented in the state court proceedings, the CCA's determination was reasonable. Plea counsel testified that he talked with Applicant regarding the defense and told him intoxication is not a defense to a knowing crime and answered Applicant's questions. Plea counsel also testified that even if an intoxication defense was allowed the facts did not support the defense, because Applicant's description of what happened the night the victim died was too detailed to support a defense that due to being intoxicated Applicant did not know what he was doing. Applicant also concedes under cross examination that his plea attorney did discuss with him that under Colorado law that the use of alcohol is not a defense to a knowing crime. Aug. 10, 2007 Withdrawal of Plea Hr'g, at 26.

The factual findings relied on by the trial court are presumed correct in this federal habeas proceeding and are supported by the state court record. Because Applicant does not point to any clear and convincing evidence to the contrary, *see* 28 U.S.C. § 2254(e)(1); *Cullen*, 131 S. Ct. at 1403, the Court finds that Applicant has not demonstrated a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

Based on the above findings, the CCA decision regarding Applicant's voluntary intoxication claim did not result in a decision that was contrary to, or involve an unreasonable application of, clearly established federal law, as determined by the

Supreme Court of the United States and did not result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  This claim, therefore, lacks merit and will be dismissed.

## B.  Claims One, Three, and Four-Procedural Default/*Martinez*

In the Order for Answer, the Court refrained from addressing Claims One through Three based on the following.

> In *Martinez v. Ryan*,  --- U.S. ---, 132 S.Ct. 1309 (2012), the Supreme Court held:
>> Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.
>
> *Id.* at 1320.  The petitioner must also show that the underlying ineffective assistance of counsel claim is "substantial"— i.e., has "some merit."  *Id.* at 1318.  The holding in *Martinez* recognizes an exception to *Coleman v. Thompson*, 501 U.S. 722, 753–55 (1991).  In *Coleman*, the Supreme Court's stated that being there is no constitutional right to counsel in a state collateral proceeding, an attorney's errors in the proceeding do not establish cause for a federal habeas petitioner's procedural default.  *See Martinez*, 132 S. Ct. at 1315.
>
> *Martinez* applies only when "the State [bars] the defendant from raising the claims on direct appeal," so that postconviction proceedings are an applicant's first opportunity to present an ineffective assistance of trial counsel claim.  *Martinez*, 132 S. Ct. at 1320; *see also Trevino v. Thaler*, --- U.S. ---, 133 S. Ct. 1911, 1915 (2013) (extending *Martinez* to circumstances in which state law does not require claims of ineffective assistance of trial counsel to be brought in collateral proceedings, but "make[s] it virtually impossible for an ineffective assistance claim to be presented on direct review" (quotation omitted)).
>
> The Colorado Supreme Court "has expressed a preference for having ineffective assistance of counsel claims brought in Crim. P. 35(c) proceedings."  *People v. Thomas*, 867 P.2d 880, 886 (Colo. 1994) (internal citations omitted); *Ardolino v. People*, 69 P.3d 73, 77 (Colo. 2003)

("In light of the considerations potentially involved in determining
ineffective assistance, defendants have regularly been discouraged from
attempting to litigate their counsels' effectiveness on direct appeal.")).
"Review of a claim of ineffective assistance of trial counsel that is raised
on direct appeal is limited to the existing record." *Downey v. People*, 25
P.3d 1200, 1202 n.3 (Colo. 2001) (citing *People v. Blehm*, 983 P.2d 779,
792-93 (Colo. 1999); see also *People v. Apodaca*, 998 P.2d 25, 29 (Colo.
App.1999) (citing *Thomas*); *People v. Price*, 240 P.3d 557, 565 (Colo.
App. 2010) ("Only 'in rare instances' are ineffective assistance of counsel
claims presented so that they 'need no further [factual] development prior
to review on direct appeal.' ") (quoting *People v. Kelling*, 151 P.3d 650,
655 (Colo. App. 2006)).

Respondents argue that *Martinez* does not apply to Claims Three
and Four because the procedurally defaulted ineffective assistance claims
are insubstantial.  ECF No. 9 at 22-31; ECF No. 19 at 10-14.
Respondents fail to address *Martinez* as it may relate to Claim One, even
though Applicant asserts this claim was defaulted due to ineffective
assistance of counsel in his initial postconviction review.

The Court is reluctant to determine at this time, without the benefit
of the state court record of Applicant's criminal proceeding, whether the
procedurally defaulted ineffective assistance issues raised in Claims One,
Three, and Four are substantial.

Order for Answer, ECF No. 23 at 7-9.

Having received and reviewed the state court record, the Court will address

Claims One, Three, and Four below pursuant to *Martinez*.

### i. Claim One

In Claim One, Applicant asserts that his plea was unknowing and involuntary

because plea counsel (1) told him that if he did not take the plea he would have to

represent himself; and (2) failed to investigate that his wife died of a heart attack and

not due to any alleged sexual assault.  Am. Application, ECF No. 16, at 5.  Applicant

further asserts this claim was exhausted on direct appeal.  *Id.*  Applicant also asserts in

the Traverse to Respondents' Answer, ECF No. 29, plea counsel informed him that if he

went to trial he would have to pay counsel more money and based on counsel's statement he felt pressured to take the deal offered or otherwise he would be unrepresented because his family could not afford the additional fees.  ECF No. 29 at 10.  Applicant further asserts that plea counsel's assessment that he would never be paroled is incorrect, especially given the facts of Applicant's case and counsel's testimony that there are viable defenses to the charges Applicant was facing.  *Id.*

Respondents contend that Claim One is procedurally barred from review pursuant to Rule 35(c)(3)(VII) because Applicant could have presented the claim in his July 2010 Rule 35(C) motion.  Supp. Pre-Answer Resp., ECF No. 19, at 5-6.  In his Reply to the Pre-Answer Response, Applicant contends that he is not barred from raising a second postconviction motion subsequent to the reinstatement of his direct appeal.  Supp. Reply, ECF No. 20, at 2.

Applicant may be correct that a postconviction motion may be allowed subsequent to Applicant's direct appeal for constitutional deprivations that may have resulted in his direct appeal, but Applicant's claims do not address deprivations that were a result of his appeal.  Applicant was granted the right to appeal the denial of his motion to withdraw his guilty plea, which he did along with the denial of his Rule 35(c) postconviction motion.  *See Velarde*, No. 12CA2183, at 4.  In his appeal he asserts the trial court's abused its discretion in denying his motion to withdraw his guilty plea.  This Court has found that the CCA's opinion addresses only Applicant's coercion claim in support of his abuse of discretion claim by the trial court.  Claim One in this action pertains to plea counsel's ineffectiveness, which were known by Applicant and subject to review at the time he filed the July 10 Rule 35(c) postconviction motion.  A review of

the Flat File in Case No. 06CR236 reveals that neither Applicant, nor postconviction counsel on Applicant's behalf, raised an ineffective assistance of plea counsel claim based on coercion in the postconviction motion.  Flat File, Case No. 06CR236, at 143-151 and 177-183.  This claim, therefore, has not been presented in state court and now is barred pursuant to Rule 35(c)(3)(VII).

As for finding a *Martinez* exception that would allow a procedural default to be waived, Applicant first must have either been unrepresented in his postconviction or subject to ineffective assistance of counsel.  Applicant originally submitted *pro se* a Rule 35(c) postconviction motion that addresses ineffective assistance of plea counsel for failure to (1) conduct interviews with the forensic specialist who conducted the autopsy, police detectives, and deputy district attorneys; and (2) view the crime scene, other evidence, and proposed exhibits.  *See* Flat File, July 8, 2010 Rule 35(c) Mot. (*pro se),* at 143-52,   The *pro se* motion was denied in part by the district court.  *See id.*, Sept. 27, 2010 Ord., at 159-65.  Postconviction Counsel then submitted an amended Rule 35(c) motion that included specifically the irregular heartbeat and voluntary intoxication claims.  *See id.*, April 27, 2011 Rule 35(c) Mot. (counseled), at 177-84.  Neither pleading included a involuntary and unintelligent plea claim based on coercion by plea counsel.

Nonetheless, even if Applicant was unrepresented or subject to ineffective postconviction counsel, as required to find a *Martinez* exception, neither of the claims supporting the ineffective assistance of counsel claim in Claim One are substantial for the following reasons.

When a habeas applicant challenges a guilty plea based upon ineffective assistance of counsel, the deficient performance prong of the Strickland test requires proof of a lack of reasonably competent advice concerning the plea. *Hill v. Lockhart*, 474 U.S. 52, 58-59 (1985).  An applicant must satisfy the prejudice inquiry by showing that the constitutionally ineffective performance "affected the outcome of the plea process.  In other words . . . that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Id.* Conclusory allegations without supporting factual averments are insufficient to support a claim of ineffective assistance of counsel.  *United States v. Fisher*, 38 F.3d 1144, 1147 (10th Cir. 1994).

This Court has addressed Applicant's irregular heartbeat claim above and found plea counsel neither was ineffective nor was Applicant prejudiced by counsel not pursuing an investigation of this issue.  As for the coercion claim, which Applicant has couched in the Amended Application, ECF No. 16 at 5, as being told he would have to represent himself if he did not enter into a plea, and in the Traverse, ECF No. 29 at 10, that plea counsel would not proceed to trial unless Applicant paid more money, the Court has reviewed the transcript of the withdrawal of plea hearing during which plea counsel and Applicant testified regarding their plea discussions.  Plea counsel, on cross examination, testified as follows:

Q.      There's been testimony that there was an agreement for a retainer of $80,000; would you agree with that?

A.      No, it was 70.

Q.      All right.

31

A.          Now, hang on a second.  Let me clarify.  I'm speaking
from memory, but I think it was 70 plus probably some
money for investigation, other expenses, maybe that totaled
80.

Q.          Okay.

A.          So I don't mean to quibble, but I just want to be as
accurate as I can.

Q.          Sure.  Was that initial retainer fee paid?

A.          In stages.  The Velarde family and I agree they would
pay it over a period of months, and they met every deadline.
They were very conscientious.

Q.          Okay.  And as to the payment of that retainer fee and
the structure of the contract, did that payment of the
fee guarantee that you would do all litigation necessary to
conclude the case, including a jury trial?

A.          I think so, yes.

Q.          All right.  At the end of time with -- when this case
came to a conclusion prior to a jury trial, had the funds run
out?

A.          No.

Q.          Did you ever tell Mr. Velarde, the funds have run out.
If you want a trial, you got to pay me some more money?

A.          Yes and no.

Q.          Okay.

A.          Again, I'm sorry to sound difficult, but here's what I
remember, without having to go back and checking my
billing records today: I believe what happened -- well, first of
all, the fee agreement was staged.  If we didn't do certain
things, we didn't get to transfer money from our trust account
to the operating account.

Q.          Certainly.

A.          And you may or may not know that the way this works is when money is paid to us, we place it in trust until we earn it, and the fee agreement laid this out.  So there were two things happening in parallel: The family would send us money at certainly [sic] deadlines, which I greatly appreciated; and then we would transfer money from trust to our operating account once we met certain milestones in the litigation.  And all of this was set forth in the fee agreement.

Q.          Certainly.

A.          I think what happened -- well, I know the fee agreement contained a large amount of money to be paid if, and only if, we were going to trial.

Q.          And that would be -- is that within the $70,000 –

A.          Yes, it's within it.

Q.          -- or was that over and above it?

A.          No, it was within it.  So I think we -- we may have reached the point where they already paid the full 70,000 and the money was in trust, or they still owed us one more stage, I forget.  But unless we tried the case, we weren't owed-- we weren't allowed to move that last amount of money from the operating -- from the trust account to the operating account.

So to answer your question, what may have happened here is they paid the full amount, but when he entered a plea, we refunded the trial fee, took it out of trust, wrote a check back to Mr. Velarde, Sr., because -- because the money wasn't earned and the case was done and -- and there was no trial.  We still had the sentencing to go, but in this case the sentencing was stipulated.  I think at that point I might have given them back the money.

Or what might have happened is that they hadn't yet got to the point where they were supposed to pay us that last amount and I told them don't, because we're not going to trial.  So one way or another it -- that's how that played out.

Q.          Let's assume -- the last scenario, that there was still a payment left, that would be that trial fee essentially.  During

33

the discussions with Mr. Velarde, when you're discussing about whether there's going to be a plea or not or whether he's going to go to trial, would you have informed him that, If we go to trial, the rest of the fee is due, but if we don't go to trial the rest of the fee is not due?

A.      Sure.  And that was, of course, set forth in the written agreement that he signed long ago anyway.  But if you're asking would it have cost him more money to go to trial, in the most naked sense, yes; but there was never a problem with getting money from the family, and in fact, we may have already had the money in our trust account when we were having those discussions.

Q.      Did you ever sort of use that as a threat against Mr. Velarde, You know what? If you want to go to trial, you got to pony up 50 grand or I'm leaving?

A.      It was never a threat.  It was at most, If we go to trial, we'll need the additional money; and if it was already in our trust account, then it's a non-issue, which I think it -- it was.  That's my best recollection.

Q.      All right.

A.      And it may have been phrased the opposite, If we don't go to trial, we'll be refunding money to your father; because that's our agreement, if there's no trial, he doesn't have to pay for a trial.

. . . .

Q.      As to threats or coercion, aside from simply advising him of what could happen, what your opinions were, what you thought should happen, what you thought he should do, did you ever make any threats or co -- coerce him in any way in this case?

A.      No.

Aug. 10, 2007 Withdrawal of Plea Hr'g, at 60-65 and 71.  Applicant testified as follows

at the same hearing during cross, redirect, and recross examination.
(cross)

A.          I was under a lot of pressure at that time.  I didn't want to sign it.  My lawyer was -- threatening me -- well, not threatening me, but he was saying that, Remember, 48 years, 48 years.  You're going to get 48 years, and I -- signed this under a great deal of pressure.

. . . .

Q.          And you said that your lawyer put a great deal of pressure on you.  What -- was the pressure your lawyer put on you?

A.          I think I just stated that, that he -- he told me that -- that -- I told him that I wasn't in my right state of mind when -- these things happened and I was under the influence of alcohol, and he -- he stated to me that, Remember, Wrighty, we can't use alcohol as a defense.

Q.          Let me slow you down there. So your lawyer discussed with you the fact that in Colorado law, alcohol is not a -- the use of alcohol is not a defense to a knowing crime?

A.          Yes, that's -- that's what he told me.  He says, This judge is a tough judge.  He's going to give you 48 years.

Q.          Okay. So you were aware of the sentencing range for second degree murder that went up to 48 years?

A.          Correct.

Q.          Did your lawyer discuss with you the possibility that you could be convicted of first degree murder, or felony murder as it's sometimes called?

A.          Yes.

Q.          Did he discuss with you the possibility of a life sentence without parole if you were to be convicted of that?

A.          Yes. Yes.

Q.          Did he tell you there was a possibility the jury could convict you of that?

A.          Yes.

Q.         Did he also talk with you about the possible penalties for the sexual assault counts being indeterminate, or to life penalties?

A.         Yes.

Q.         That if you were to be convicted of either of the sexual assault counts, you could be incarcerated for up to your natural life?

A.         Yes.

Q.         And did he then encourage you that the offer that was made to you, the 33-year stipulation, was a good deal?

A.         I don't know if he said it was a good deal, but he told me that I -- I -- he told me that -- I looked at him -- I remember telling him, I don't know if I'll live that long, and then he told me, I think you'll live that long, and I told him, I don't think so, and -- and he said, You will.  And like I said, I signed it under a great deal of pressure.

And -- and I rethought it, and if they do find me guilty and they take me -- they take me all the way and they -- they put an indeterminate life sentence on me and I lose, I will lose by telling the truth. I will lose by telling the truth before my Lord, Jesus Christ, that I believe that she did pass from a heart attack and losing a lot of blood while we were involved in intercourse.

And if -- if the Court convicts me on this, and to that measure, so be it, because I did not murder my wife, I didn't plan it, and it was -- it was an accident.  And that's the reason why I want to take back my plea.  And if -- if they put me in for 48 years, that's the rest of my life.  I'm already 42 years old, and I think I deserve –

. . . .

Q.         Sir, would you agree with me that Mr. Cherner told you that the decision whether to go to trial or not was your decision, but he strenuously told you he thought that was a bad idea to go to trial?

A.         Yes, he kept threatening me with 48 years;  We're gonna lose. We're gonna lose.

Q.          Okay. And when you say "threatening," I want to make sure I understand what you mean.  What he told you was it was his opinion that you would lose at trial and that you would receive at least 48 years in prison?

A.          Yes.

Q.          Were there any other threats besides that, that -- him telling you what he thought would happen?

A.          No, just -- just that -- that threat of -- of 48 years and no life -- no -- I would not see daylight again. I wouldn't -- and --

. . . .

Q.          I just want to make sure that one point is crystal clear. You've used the word "threat" with regard to your lawyer, and then you said that what he would say is, We're going to lose, and if we lose, these are going to be the consequences.  Were there any other threats or coercion that your lawyer made against you?

A.          The only thing he was threatening me was -- was the point, Remember, 48 years.  Remember?  Remember, 48 years.  You can't -- there's no defense in the state for alcoholism.

I said, Yeah, but I did not -- I did not know when you do this. And it states in the -- in the -- on -- it doesn't state right here on this one, but the one that I -- that -- I remember the plea agreement that I signed was -- was that you knowingly and you did voluntarily murder your wife, and I said, no, I didn't do it.  And he says, Remember, 48 years, 48 years.  And I didn't want to.  I had a hard time. We stood there for 10, 15 minutes before I signed it.

Q.          Okay. Did your lawyer ever threaten -- tell you what would -- that you would be abused in prison, tell you that you would die, anything like that, be killed in prison?

A.          No, he didn't do that.

Q.          Did he ever threaten you physically in any way –

A.          No.

Q.          -- if you don't do this, I'll hit you, or do --

A.          No.

Q.          -- anything like that?

A.          No.

Q.          He simply advised you of what he thought would happen and that that would be a more severe sanction than what you received under the current plea arrangement?

A.          That's -- that's -- he kept threatening me with the 48 years.

. . . . (redirect)

Q.          Very large amount of money.  You remember that the retainer agreement had no coverage, no phase mentioned for going to trial?

A.          No, it did not. I don't –

Q.          Everything stopped if you went to trial?

            Yes. I'm not even sure of the -- too much of the financial. I was -- I was not -- there was some communication there that was not fully -- that was not fully divulged to me.

Q.          And do you remember it being a distinct part of this scenario that if you did not accept this deal, you would lose your lawyer?  He would not go to trial?

A.          One more time, please?

Q.          Do you remember that if you did not accept this plea agreement, that you would lose your lawyer?

A.          Yes.

Q.          Because he would not go to trial?

A.          Yes, I would lose -- I would lose -- I would lose the lawyer. I believe that he said he would go all the way to the end, but money has been exhausted, or something to that effect.

Q.          And he was ready to quit?

A.          Yes.

Q.          Unless you took this deal?

A.          Yes. Yes. He -- he said that the money was exhausted, and that seemed to me like he was -- that that's as far as he would go, was go to motions -- or go to -- he -- he stated that there was no more money, that I had --

Q.          Okay.

A.          -- I had no more money. I sold everything to get this lawyer. I sold my cows. I sold everything I had to get this lawyer. I am officially broke. I -- I don't have -- I believe that I don't -- I -- I sold everything that I had.

Q.          And when you said he threatened you, although he didn't threaten you in any illegal way, isn't it true that he made it known that he would not any longer represent you?

A.          Yes.

Q.          Did that have an impact on you and your decision-making here?

A.          Yes.

Q.          Did that influence you?

A.          Yes.

Q.          How did it influence you?

A.          Well, it -- it made me mad because -- but that he -- I had gave him so much money and -- and he couldn't -- he couldn't -- he couldn't -- I paid him a lot of money and -- and

> it made me mad that he couldn't represent me without -- he wanted more money or something like that and I was -- I was -- I was mad at him.

Q.         You remember how much you paid him?

A.         I -- 80 grand, 88 grand.

Q.         No further questions, Judge -- $80,000?

A.         $80,000.

. . . . (recross)

Q.         In your words, you said that Mr. Cherner said he would represent you all the way, or to the end, but you just hadn't paid the trial fee yet?

A.         I believe he said he would -- it's going to take more to go to trial is what he said.

Q.         And that was part of the agreement you had with him earlier was that --

A.         No.

Q.         -- the further you went --

A.         No.

Q.         -- the more money it would cost?

A.         No, huh-uh. No. There was a fixed fee. There was a fixed fee of 80 grand to take it all the way to trial.

Aug. 10, 2011 Withdrawal of Plea Hr'g, at 25-33 and 37-40.

Applicant based his coercion on plea counsel's continual reminder to Applicant that he could face forty-eight years if he went to trial.  Applicant does not argue that plea counsel threatened him in any other way.  Applicant's testimony only supports a finding that plea counsel was strongly urging him to plead guilty, which is "proper conduct of an

40

attorney if he believes that a plea is the best course." *See Nicholls v. Bigelow*, 558 F.

App'x 778, 786 (10th Cir. 2014) (citing *Miles v. Dorsey*, 61 F.3d 1459, 1470 (10th Cir.

1995).

Furthermore, when Applicant was questioned about the retainer fee on redirect,

he stated plea counsel told him that if he insisted on going to trial he would need more

money, he, however, also testified that he did not know details of the financial

arrangements of the retainer for plea counsel.  Furthermore, Applicant's father testified

at the withdrawal of plea hearing that Applicant was not well informed about the details

of the retainer and the $80,000 was the amount to be paid to plea counsel for all

proceedings including a trial.  Aug. 10, 2011 Withdrawal of Plea Hr'g, at 43-44.  Plea

counsel provided a sound description of the fee arrangement and nothing in Applicant's

or his fathers' testimony demonstrates that plea counsel was requesting more money

than the $70,000 or $80,000 that was originally agreed to for covering all proceedings

including trial, which is the basis of Applicant's coercion claim.

Moreover, even Applicant's statement that plea counsel threatened to withdraw

from the case if Applicant did not accept the plea agreement is insufficient to

demonstrate coercion and falls under an attempted persuasion by plea counsel that

entering into a plea is in Applicant's best interest.  *See Miles*, 61 F.3d at 1470 (citing

*Uresti v. Lynaugh*, 821 F.2d 1099, 1102 (5th Cir. 1987) (attorney's threat to withdraw

from case if client did not accept plea bargain was insufficient to establish that plea was

involuntary)).  The Court finds no basis for a coercion claim against plea counsel.

Finally, the Tenth Circuit has noted that the "colloquy between a judge and a

defendant before accepting a guilty plea is not pro forma and without legal significance.

Rather, it is an important safeguard that protects defendants from incompetent counsel or misunderstandings." *Fields v. Gibson*, 277 F.3d 1203, 1214 (10th Cir. 2002). Further, "[n]umerous courts have denied relief under §§ 2254 and 2255 to petitioners alleging that their guilty pleas were the product of ineffective assistance, where the plea colloquies have demonstrated otherwise." *Hammons v. Paskiewicz*, 368 F. App'x. 904, 907 (10th Cir. 2010) (citing *Fields*, 277 F.3d at 1214).

The colloquy between the district court and Applicant in part is as follows:

THE COURT:  Mr. Velarde, by entering a plea in this case, you'll be waiving or giving up certain rights.  Those rights include the right to a jury trial, the right to call witnesses on you own behalf, the right to confront or cross-examine witnesses, and the right to require the People to prove each and every element of the charges against you beyond a reasonable doubt.  Once you enter a plea, those rights are gone forever.  Do you understand that?

THE DEFENDANT:  Yes.

. . . .

THE COURT:  Finally, there are potential punishments that may be imposed upon you in this case.  They are contained in writing in the Request to Plead Guilty form.  I want to make certain you understand them at this point.

For the charge of Murder in the Second Degree, you could receive a sentence in the presumptive range of 8 to 24 years in the Department of Corrections.  If mitigation is established, that sentence could be reduced to four years; if aggravation is established, that sentence could be increased to 48 years.

Mr. Cherner, it appears to the Court from the nature of the disposition that there is an agreement, in fact, that aggravation does exist?  That would, I assume, be based upon the death?

MR. CHERNER:  Your Honor, there is only one sentence for second degree murder in this state, it's 16 to 48, absent a stipulation, of course.  But there -- the terms "presumptive" and "extraordinary range"

don't apply because it's a crime of violence and it's automatically 16 to 48 under any circumstance.

THE COURT:  Well, I guess what I was getting at is that your -- my understanding is that there's not going to be any requirement, this being in the aggravated range, there be some additional determination by a finder of fact other than the Court?

MR. CHERNER:  There's a nolo position, Your Honor.

THE COURT:  All right.  Thank you.

. . . .

For added Count Seven, the charge of Criminal Attempt to Commit Sexual Assault as a Class 5 Felony, you could receive a sentence in the range of from 1 to 3 years in the Department of Corrections in the presumptive range; that -- if mitigation were presented, that sentence could be reduced to 6months; with -- if aggravation were presented or established, that sentence could be increased to 6 years.  In addition, there would be a mandatory period of 2 years and a potential fine of from 1,000 to $100,000.

Mr. Cherner, my understanding is that there is an aggravated sentence on this to run concurrent with the sentence on Count Six; is that Correct?

MR. CHERNER:  Yes, Your Honor.

THE COURT:  Would there be -- and based upon the  -- well, would there be any requirement that this determination, as to aggravation, be made a factfinder other than the Court?

MR. CHERNER:  No.

THE COURT:  All right.  And I'm going to assume that based upon the facts presented in this case, that would form the basis for the aggravation her, Mr. Vahle?

MR. VAHLE:  Judge, that's correct.  The crime of violence statute lists any sexual crime under 18-3 Section 4 where death resulted.  That are the facts in this case and that is the information.

. . . .

THE COURT:  Mr. Velarde, did you understand all the punishments -- the potential punishments that the Court has just read off?

THE DEFENDANT:  Yes.

THE COURT:  By pleading guilty, Mr. Velarde, you are admitting the nature of the charge and that the People can prove this charge -- these charges beyond a reasonable doubt.  I want you to listen carefully now while Mr. Vahle explains the elements of the offenses to which you'll be pleading.  Mr. Vahle?

MR. VAHLE:  Thank you, Your Honor.

Mr. Velarde, you have a right to go to trial on these matters.  If you were to go to trial on these matters, the People would have to prove each and every element of any count to which you are charged to a unanimous jury of 12 people.  We would have to prove each and every element beyond a reasonable doubt.  As to added Count Six and Count Seven, I want to explain the elements of each of those counts to you.

As to added Count Six, what we would have to prove is that on or about March 29th of the year 2006, you, Wrighty Wilkins Velarde; were in the county of Douglas and the State of Colorado.  I would have to show that you acted unlawfully and feloniously and knowingly.  All three of those terms were defined to you, sir, in the written document that you filled out this morning.  Did you want me to redefine either of those three terms for you?

THE DEFENDANT:  No.

MR. VAHLE:  What I would have to show is at that time that you caused the death of Marci Notsinneh in violation of 18-3-103 Subsection 1.  When I say that you caused her death, "caused" is a legal definition.  It means the act or a failure to act which in natural and probable sequence produced the claimed injury, death in this case.  It is a cause without which the claimed injury would not have occurred.

Sir, do you have any questions about what it means to plead guilty to People's added Count Six, Murder in the Second Degree?

THE DEFENDANT:  No.

MR. VAHLE:  As to Count Seven, what I would have to prove is at or about the same date and time; once again, you, Wrighty Velarde; acted unlawfully and knowingly and feloniously.  I'd have to show that you

attempted to inflict sexual intrusion or sexual penetration on Marci Notsinneh, and I would have to show that you knew that the victim was incapable of appraising the nature of her conduct at that time.

I want to talk about a couple of definitions within that statutory definition.  A person commits criminal attempt if acting with the kind of culpability otherwise required for the commission of the offense, in this case that is knowingly, as has been defined for you, he engages in conduct constituting a substantial step toward the commission of the offense.

A "substantial step" is any conduct, whether act or omission or possession, which is strongly corroborative of the firmness of the actor's purpose to complete the commission of the offense.  Factual or legal impossibility of committing the offense is not a defense if the offense could have been committed had the attendant circumstances been as the actor believed them to be.  Nor is it a defense that the crime of attempt was -- the crime attempted was actually perpetrated by the accused.

When I talk about "sexual intrusion" and "sexual penetration," those terms also have statutory definitions particularly germane to this case.

"Sexual intrusion" means any intrusion, however, slight, by any object or any part of a person's body, except the mouth or tongue or penis, into the genital or anal opening of another person's body if that sexual intrusion can reasonably be construed as being for the purpose of sexual arousal, gratification, or abuse.

"Sexual penetration" means sexual intercourse, cunnilingus, fellatio, anilingus, or anal intercourse.  The admission need not be proved as an element of any sexual penetration.  Any penetration, however, slight, is sufficient to complete the crime.

Sir, all of those things put together are in violation of 18-3-402 Subparagraph (1)(b) and 18-2-101 of the Colorado Revised Statutes, Criminal Attempt to Commit Sexual Assault.  Do you have any questions about what it means to plead guilty to that added count?

THE DEFENDANT:  No.

MR. VAHLE:  Thank you, Judge.

THE COURT:  Mr. Velarde, did you understand the elements as explained by Mr. Vahle?

THE DEFENDANT:  Yes.

THE COURT:  Mr. Cherner, I have conducted the preliminary hearing in this matter.  I've also reviewed the affidavits in the court file. Would there be the requirement of any additional factual basis?

MR. CHERNER:  No, we agree that's the factual basis, Your Honor.

THE COURT:  All right.  Mr. Velarde, then, how do you plead to added Count Six, the charge of Murder in the Second Degree?

THE DEFENDANT:  Guilty.

THE COURT:  And how do you plead to added Count Seven, the charge of Attempted Sexual Assault as a Class 5 felony?

THE DEFENDANT:  Guilty.

THE COURT:  Are these pleas being made by you freely and voluntarily?

THE DEFENDANT:  Yes.

THE COURT:  By that I mean has anyone threatened you, pressured you, or coerced you in some way to enter these pleas against your will?

THE DEFENDANT:  No.

THE COURT:  Have there been any promises made to you, other than what I've been told today here in open court, in order for you to enter these pleas?

THE DEFENDANT:  No.

THE COURT:  Are you satisfied with the representations of Mr. Cherner and Ms. Pagett?

THE DEFENDANT:  Yes.

THE COURT:  Do you wish the Court to accept your pleas?
THE DEFENDANT:  Yes.

THE COURT:  Very well.  The Court will find the defendant is competent to proceed; that he understands the nature of the charges in

> this case and the consequences of entering pleas; that he understands that he'll be waiving or giving up certain rights; that he understands the Court is not bound by any representations; the plea is being made today knowingly, intelligently, freely and voluntarily; a factual basis does exist; and the defendant is represented by competent and effective counsel.

Mar. 16, 2007 Providency Hr'g at 8-17.

Based on the above findings, neither Applicant's coercion claim nor his irregular heartbeat claim is substantial.  Without such a finding, the Court need not determine whether the postconviction review proceeding was sufficient or review the merits of Claim One.  *Martinez*, 132 S. Ct. at 1318.  Claim One is procedurally defaulted and, therefore, barred from federal habeas review.

### ii Claim Three

In Claim Three, Applicant asserts that plea counsel was ineffective in not advising him of the automatic sentence enhancer and incorrectly advising him that he would be parole eligible in ten to twelve years, instead of having to serve three quarters of his sentence.  ECF No. 16 at 6 and ECF No. 29 at 6-7.  In the Traverse, Applicant adds that plea counsel had an obligation to investigate how much time Applicant would have to serve before becoming parole eligible in order to provide him with the correct advice so he could make a decision as to whether to go to trial or enter a plea.  ECF No. 29 at 7.  Applicant also asserts in the Traverse, ECF No. 29 at 10, in support of Claim One that plea counsel incorrectly advised him that if he went to trial he would be subject to a life sentence without a possibility of parole, even though the facts of his case would support a viable defense.

Respondents argue that even if plea counsel misadvised Applicant on his parole eligibility date he is unable to show prejudice under *Strickland* in light of the case record. ECF No. 25 at 33.

Applicant concedes this claim is defaulted.   *See*  ECF No. 16 at 6, and relies on *Martinez* for the basis of cause for procedural default.

Applicant's assertions in support of Claim Three, however, are highly speculative.  He bases his arguments on his belief that plea counsel does not state he had represented inmates who were convicted under the Colorado indeterminate sentencing act "or that [counsel] has been there when [inmates] are paroled."  ECF No. 29 at 10.  He further contends that the facts in his case, that he had no prior criminal history, the victim was his wife, and it was common for them to have anal sex, would have more likely than not resulted in his being paroled from a sentence subject to the indeterminate sentencing act.  *Id.*

Applicant does not state credible assertions that would support his speculative claims regarding a viable defense and plea counsel's misadvice on Applicant's parole eligibility date.  During the withdrawal of plea hearing, plea counsel testified as follows:

Q.      Did you have discussions with him about the elements
        of the crimes with which he was charged?

A.      Yes.

Q.      Tell him what would need to be proved at trial in order
        to find him guilty of those -- of those crimes?

A.      Yes.

Q.      Discuss with him how the evidence in the case, the
        facts of the case, would relate to those elements?

A.          Yes.

Q.          Did you discuss with him the possible penalties that could be imposed for all of those charges?

A.          Yes.

Q.          The possibility of a life sentence if he were found guilty of first degree murder?

A.          If he was found guilty, it wasn't a possibility, it was required.

Q.          A certainty?

A.          Yes, that was communicated to him.

Q.          Secondarily, even if you won on the murder count, did you discuss with him the possibility that if he were convicted of a sexual assault count, that he could receive an indeterminate prison sentence which could result in a sentence of up to life in prison?

A.          It would result in a life sentence with the possibility of parole.  There was nothing hypothetical about the result. The only hypothetical was when he would be released.  But the sentence is life.

Aug. 10, 2007 Withdrawal of Plea Hr'g at 67-68.

Applicant does not deny that he was charged with first degree murder and sexual assault.  He also does not deny that the sentence for first degree murder is life in prison and for sexual assault a possibility of an indeterminate prison sentence up to life in prison.  Faced with a life sentence if convicted of murder or an indeterminate sentence if convicted of sexual assault with the possibility of parole it is highly unlikely that Applicant would have opted to go to trial even if he had known that his parole eligibility would be from ten to fifteen years more than what plea counsel allegedly told him it would be.

49

Furthermore, even though "gross misadvice about parole eligibility can render legal assistance ineffective and invalidate a plea," *see Chrisman v. Mullins*, 213 F. App'x 683, 688 (10th Cir. 2007) (finding an 85% requirement of sentence served before parole eligible) (citing *Beavers v. Saffle*, 216 F.3d 918, 925 (10th Cir.2000)); *see also Hill*, 474 U.S. at 56-57, the Sixth Amendment does not encompass those aspects of the prosecution which are collateral, *see Varela v. Kaiser*, 976 F.2d 1357, 1358 (10th Cir. 1992) (holding that counsel's failure to advise alien client that deportation was a possible collateral consequence of guilty plea did not amount to ineffective assistance of counsel).  Restrictions on parole eligibility involve "collateral" consequences of a nolo contendere plea.  *See Holmes v. United States*, 876 F.2d 1545, 1549 (11th Cir. 1989); *see also Hill*, 731 F.2d at 570) ("[t]he details of parole eligibility are considered collateral rather than direct consequences of a plea") (citations omitted).  Any failure to inform Applicant of consequences collateral to a plea, such as having to serve 75% of a sentence before being parole eligible, does not render the plea involuntary, does not implicate the Sixth Amendment, and, therefore, cannot be the grounds for a viable ineffective-assistance-of-counsel claim.  *See Hill*, 474 U.S. at 55 (failure to inform a defendant at a plea hearing of the terms of parole eligibility is not a federal constitution violation); *see also Perkis v. Sirmons*, 201 F. App'x. 648, 652 (10th Cir. 2006) (state court's failure to inform defendant that "he would be ineligible for parole prior to serving 85% of his sentence" was merely a failure to inform petitioner about a collateral consequence of the plea and does not invalidate a plea agreement).

Based on the above findings, neither Applicant's parole eligibility claim nor his viable defense claim is substantial.  Without such a finding, the Court need not

determine whether the postconviction review proceeding was sufficient or review the merits of Claim Three.  *Martinez*, 132 S. Ct. at 1318.  Claim Three is procedurally defaulted and, therefore, barred from federal habeas review.

### iii.  Claim Four

In Claim Four, Applicant asserts that counsel was ineffective because he failed to seek suppression of the statements Applicant made to the police, even though counsel knew that Applicant had requested counsel and the police continued to question him. ECF No. at 16 at 7.  Applicant does not address Claim Four in his Traverse.

Respondents argue that plea counsel filed two motions to suppress Applicant's police statements, ECF No. 25 at 36.  Respondents further contend that plea counsel postponed the hearing on these motions until after plea negotiations were finished in an attempt to negotiate a better plea and that Applicant knew at the providency hearing that the motions were pending, yet he expressly indicated he was satisfied with counsel performance.  *Id.* at 37.

Upon review of the Flat File, Case No. 06CR236, at 49 and 51, the Court finds a motion to suppress statements made by Applicant at the El Paso County Jail and an assertion of privilege regarding these statements was filed by counsel.  Both motions were filed on November 27, 2006, along with at least eight to ten other motions. Subsequently, on December 15, 2013, the motions were continued at plea counsel's request, *see* ECF No. 9-1 at 21, and a request to plead guilty, Flat File at 96, entered on March 16, 2007.  At the Rule 35(c) hearing, plea counsel testified as follows:

> Q.          Mr. Cherner, to the best of your recollection, would
>             you kind of just take us through the procedural history of
>             your representation of Mr. Velarde.

A.          Sure.  Like any criminal case, there's a period where you get familiar with the facts both through discovery and through speaking with the client.  We used an investigator.  We interviewed any number of witnesses.

We got ready for the preliminary hearing.  I know I interviewed the coroner.  In fact, I [put the coroner on the stand at the preliminary hearing.  We did that hearing.  We had a theory advanced there about how the injuries were inflicted.  We were unsuccessful in getting bond set and defeating the probable cause finding.

We continued at that point to investigate the case, develop new information.  When I say we, it was myself and my associate, my staff, and investigator.

Frequent contact with Mr. Velarde.  Met a number of times with his family.  Various issues came up along the way.  We researched them.  We filed motions.  There was an extensive series of video interviews.  I know I watched those early in the process, made notes.  I don't recall if we transcribed them or not.

Eventually -- well, we had a series of discussions about a plea bargain.  The district attorney switched on us.  I forgot his name, but he left the case and went into private practice.  Mr. Vahle took the case over.  We met briefly with Ms. Chambers who told us she didn't know anything about the case and she referred us to the other lawyers.

We did what we typically do when we defend a serious felony which is there's always the possibility of a disposition, but at the same time you're preparing for trial.  So you're working on two tracks.

As we came up to motions, it seemed like a good time to try to resolve the case because although it was going to be an uphill battle to suppress his statements, we did have at least some credible arguments, and the uncertainty as to whether or not that would be successful, that is the suppression of the statements, I think put us in a position then to have the best discussion for a plea bargain.

> That uncertainty drives both sides.  The threat of litigating the motion I though was better than actually litigating the motion.  So we were able to reach a disposition right before the motions.
>
> The motions may have been continued once to let us talk more.  I'm not sure . . . .

Sept. 2, 2011 Rule 35(c) Hr'g at 12-14.

Contrary to Applicant's argument, plea counsel did file motions to suppress Applicant's statements.  It also is not clear, as  Applicant suggests, that he was not represented by counsel when he made the statements to the police.  *See* Aug. 10, 2007 Withdrawal of Plea hr'g at 56-57.  Finally, plea counsel's decision to continue a hearing on the suppression issue is no more than a strategy decision and has a presumption of effectiveness.  *See Strickland*, 466 U.S. at 689 (Applicant has burden to overcome this presumption by showing that the alleged errors were not sound strategy under the circumstances.); *Rushin*, 642 F.3d at 1307 (Applicant has burden to prove that the errors were so serious that "counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment.") (citations and internal quotations omitted).

Based on the above findings, Applicant's suppression claim is not substantial. Without such a finding, the Court need not determine whether the postconviction review proceeding was sufficient or review the merits of Claim Four.  *Martinez*, 132 S. Ct. at 1318.  Claim Four is procedurally defaulted and, therefore, barred from federal habeas review.

## V. ORDERS

Based on the above findings, it is

ORDERED that the Application for a Writ of Habeas Corpus Pursuant to 28

U.S.C. § 2254, ECF  No. 16, is DISMISSED WITH PREJUDICE.  It is

FURTHER ORDERED that the issuance of a Certificate of Appealability pursuant to 28 U.S.C. § 2253(a) is denied.  Applicant has not made a substantial showing of the denial of a constitutional right such that reasonable jurists could disagree as to the disposition of his petition pursuant to the standards of *Slack v. McDaniel,* 529 U.S. 473, 484 (2000).  *See* 28 U.S.C. § 2253(c)(2).  It is

FURTHER ORDERED that leave to proceed *in forma pauperis* on appeal is denied.  The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order is not taken in good faith, and, therefore, *in forma pauperis* status is denied for the purpose of appeal.  *See Coppedge v. United States*, 369 U.S. 438 (1962).  If Applicant files a notice of appeal he must also pay the full $505 appellate filing fee or file a motion to proceed *in forma pauperis* in the United States Court of Appeals for the Tenth Circuit within thirty days in accordance with Fed. R. App. P. 24.

DATED at Denver, Colorado, June 17, 2015.

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge